UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **MIA BERUBE,**<br>*Plaintiff,*<br><br>v.<br><br>**TRIO PROPERTIES LLC,** *alias,*<br>*Defendant.* | **CIVIL ACTION NO.:   3:18-cv-2109** |

## COMPLAINT AND JURY DEMAND

1. This action is commenced by MIA BERUBE (hereinafter "Plaintiff"), against TRIO PROPERTIES LLC, (hereinafter "Defendant"), to remedy and seek relief for unlawful employment practices arising under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.,* Connecticut Minimum Wage Law General Statute § 31-58 et seq. (§ 31-58"), the Family and Medical Leave Act, 29 U.S.C. §2615, and Connecticut Family and Medical Leave, Chapter 557, Sec. 31-51.

## JURISDICTION AND VENUE

2. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  Plaintiff's state claims are so related to Plaintiff's federal claims in that they form part of the same case or controversy.  Judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

4. Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant's place of business, the relevant records, and the alleged unlawful practices occurred and/or continue to occur within the state of Connecticut in the judicial district of this Court.

## PARTIES

5. Plaintiff presently resides in the city of New London, county of New London, within the State of Connecticut and formerly worked for Defendant at its Groton, Connecticut location.

6. Defendant, Trio Properties LLC is domiciled in the city of Glastonbury, county of Hartford, state of Connecticut.

7. Defendant Trio Properties, LLC, owns and operates a number of residential facilities in multiple states and/or otherwise engages in interstate commerce.

## FACTUAL ALLEGATIONS

8. On or about October 24, 2016, Plaintiff was contacted about an open position for Property Manager at The Ledges by Trio Properties LLC.

9. The Regional Manager, Maryanne Duplice, asked Morgan Miller, the Property Manager at the time, to reach out to Plaintiff for an interview.

10. After several interviews with the corporate office and owners of the property, Plaintiff was offered the position at $52,000 a year, a salaried, exempt position classification.

11. Plaintiff started her position as Property Manager of The Ledges on or about December 29, 2016.

12. At all times relevant, Plaintiff consistently worked evenings, weekends, and more than 40 hours per workweek.

13. Defendant told Plaintiff they would train her and mold her into the Property Manager they desired.

14. Plaintiff was upfront with the Regional Manager from the very first interview about her limited knowledge and experience in property management.

15. Plaintiff was reassured that she would be trained.

16. Plaintiff was, at first, trained with the company trainer, JoAnne Aviles, at the corporate office on the first two days and was then trained by Morgan Miller, the previous Property Manager, for approximately one month at The Ledges location, transitioning the position over to Plaintiff.

17. Plaintiff and Morgan Miller went through a training checklist and Plaintiff was taught some of the OneSite software and weekly reporting, after which point, the training stopped.

18. Plaintiff was not given further training; Plaintiff trained herself and sought help where needed.

19. At all times relevant, Plaintiff performed her job at or above the employer's reasonable expectations.

20. Plaintiff's background is without specialized training or education; Plaintiff has only a high school education.

21. At all times relevant, Plaintiff's job required collecting and depositing rents, processing move-outs, handling delinquencies, assisting with evictions, tracking and resolving tenant disputes and complaints, and ensuring contractors kept the property clean and repaired.

22. At all times relevant, Plaintiff's job did not involve the exercise of discretion and independent judgment and instead, involved learned skills and following well-established techniques and procedure.

23. On or about May 7, 2017, Plaintiff's father passed away and she took the following week off for bereavement.

24. Plaintiff's mother was hospitalized two days later, on or about May 9, 2017, and remained hospitalized until she passed away on June 21, 2017.

25. During the five weeks of Plaintiff's mother's hospitalization, Plaintiff spent some mornings at the hospital advocating and managing her mother's care.

26. Due to being there for her dying mother, Plaintiff was forced to miss some time from work, however, Plaintiff made up this time by staying late at the property she managed.

27. On or about June 15, 2017, approximately 45 minutes after Plaintiff got to work following a visit with her mother at the hospital, Plaintiff received a phone call from her father in-law, stating that Plaintiff's sister in-law had passed away by taking her own life.

28. Plaintiff left work immediately after learning the devastating news to be with her husband.

29. Plaintiff returned to work the next day, Friday, June 16, 2017.

30. On or around Monday June 19, 2017, Plaintiff flew with her husband to North Carolina to attend her sister in-law's funeral.

31. While Plaintiff was in North Carolina, she received a phone call from her Regional Manager stating she had been given a $2,000 increase in salary.

32. Plaintiff was on a return flight to Connecticut on Wednesday, June 21, 2017, when she learned of her mother's passing.

33. Plaintiff received two days of bereavement for her sister in-law's passing and five days for her mother's passing; the remaining time off of work was vacation time.

34. During the time Plaintiff's mother was in the hospital and through the passing of her sister-in-law and mother, Plaintiff's employer formally did not express any problems with Plaintiff's schedule due to the multiple deaths and illnesses in the family so close together.

35. Informally, Plaintiff sensed hostility from some employees at work due to being away from work to care for family members and working various hours to compensate the time.

36. During the time Plaintiff was away from the property, Terry George, expressed she was frustrated that Plaintiff was not there all the times she was and also that Ms. George was upset she had not received the raise she was expecting.

37. The owner of the property called Ms. George to discuss the matter.

38. Upon information and belief, Ms. George expressed unhappiness to management about Plaintiff's family medical issues which required Plaintiff to be away from the office at times.

39. Around that same time, on or about Wednesday, July 12, 2017, Maryanne, the Regional Manager, and Plaintiff, had a meeting with Terry George to discuss the tension.

40. It was during this meeting that Plaintiff discussed the medical conditions and subsequent deaths in her family and stated that she should have taken FMLA.

41. Plaintiff was not aware that she was not eligible for FMLA due to not being at her employer for a year.

42. No one corrected Plaintiff about the use of FMLA.

43. Plaintiff later found out that she did not qualify for FMLA until she had been there for one year, in or around late December 2017.

44. In that meeting, Maryanne and Plaintiff also discussed additional things that Plaintiff wanted to be trained on and Plaintiff even provided a list.

45. However, the training that Plaintiff was promised never occurred and Plaintiff was forced to continue to learn the intricacies by asking questions as they arose.

46. On or about Monday, November 27, 2017, Plaintiff's Assistant Manager, Terry George, gave her notice.

47. Terry George's last day was on or about Friday, December 8, 2017.

48. During thanksgiving in late November 2017, Plaintiff's husband became gravely ill with a serious medical condition.

49. Plaintiff was not yet eligible for FMLA.

50. Plaintiff took care of her husband around her work hours.

51. On or around December 12, 2017, Plaintiff indicated to her management and coworkers serious concern for her husband's health as he had been sick since Thanksgiving weekend and was not getting any better.

52. Also, on or around Tuesday, December 12, 2017, Plaintiff was issued a final written warning out of nowhere.

53. Plaintiff had not been provided prior discipline to justify any final warning.

54. As such, Plaintiff was shocked by the final warning.

55. The "final warning" was issued by Plaintiff's Regional Manager and it was discipline for asking how to handle the petty cash system and utility invoices, tasks that were not normally performed by Plaintiff.

56. Plaintiff told her Regional Manager she disagreed with the written warning and explained that the only reason Plaintiff was receiving the warning was due to the fact she had not been adequately trained and that she should not be disciplined for asking a question to ensure that she could do her job correctly.

57. Plaintiff sensed that the written warning was pretext for preventing or interfering with Plaintiff's ability to take FMLA to care for her husband.

58. Plaintiff sensed this pretext because her eligibility date to take FMLA was only in a couple of weeks away and it seemed very likely she would need it for her husband.

59. As such, Plaintiff refused to sign the warning.

60. During the next few weeks in December of 2017, Plaintiff continued to perform her job to the best of her ability, but was afraid to ask questions for fear of losing her job, even though Plaintiff's employer continually promised training and did not provide it.

61. Plaintiff's new Assistant Manager, Nellie Torres, started working at The Ledges on Tuesday December 26, 2017.

62. On the morning of Wednesday, December 27, 2017, Plaintiff's husband was rushed to the emergency room while Plaintiff was at work.

63. Plaintiff remained at work to train the new Assistant Manager.

64. Plaintiff was informed her husband was bleeding internally and needed a blood transfusion.

65. Plaintiff was panicked.

66. Plaintiff remained at work but planned to leave at 5:00 pm to be with her husband at the hospital.

67. When Plaintiff was about to leave at 5 o'clock, a resident came into the office wanting to do a lease settlement agreement.

68. Plaintiff was unable to find a settlement form, but knew how to do a settlement.

69. Plaintiff was in a flustered state, obviously concerned about her husband, so she asked JoAnne if she knew where the form was.

70. The following day, Thursday December 28, 2017, Plaintiff contacted her Regional Manager via text message to let her know that she had left work to go to the hospital to speak to her husband's doctors.

71. On Friday morning, December 29, 2017, Plaintiff contacted her Regional Manager via text message at 8:19 am to let her know that Plaintiff would be going to the hospital to see her husband briefly and then would be at work.

72. Plaintiff became eligible for FMLA on or about December 29, 2017.

73. Plaintiff's Regional Manager asked how Plaintiff's husband was doing.

74. Plaintiff reported his condition was poor.

75. On Tuesday, January 2, 2018, Plaintiff further informed her Regional Manager of the seriousness of her husband's conditions as one of his major organs was failing.

76. Plaintiff explained to her Regional Manager that she may be forced to take some time off to care for her husband's serious medical condition.

77. That day Plaintiff printed out information to apply for FMLA.

78. Plaintiff's Leasing Consultant, Luis De La Cruz, saw the FMLA documents on the printer and handed them to Plaintiff.

79. In response to seeing the documents, Luis De La Cruz, expressed concerns to Plaintiff about being short staffed if Plaintiff were to be out on FMLA.

80. Mr. De La Cruz also stated to Plaintiff that he needed time off (on FMLA) for his daughter's surgery and someone else was going to be out (on FMLA) on maternity leave.

81. The next day, before Plaintiff could submit the FMLA forms, on Wednesday, January 3, 2018, Plaintiff contacted her Regional Manager via text message at 10:17 am to inform her that Plaintiff was at the hospital and would be on the property working shortly.

82. Plaintiff's Regional Manager replied, "OK Thanks."

83. Plaintiff intended to submit her FMLA forms as Plaintiff's husband was not improving.

84. Only two days later on or about Friday, January 5, 2018, Plaintiff arrived at the property at approximately 9:20 am, and went straight to work.

85. Plaintiff's Regional Manager and Morgan Miller, from the corporate office, were already on site.

86. Plaintiff's Regional Manager asked Plaintiff into the conference room with Morgan Miller, as a witness, and then terminated Plaintiff.

87. Plaintiff was terminated just before she would have been able to submit her forms for FMLA and state medical leave.

88. Plaintiff asked why she was being terminated and Plaintiff's Regional Manager could not answer.

89. Plaintiff's Regional Manager had to try to refer to a counseling form to find a reason to explain Plaintiff's termination.

90. The reason Plaintiff was given for her termination was that she had been unable to find the form needed for a Lease Settlement Agreement on December 27, 2017, the day Plaintiff's husband was rushed to the hospital, bleeding internally, and needing a blood transfusion.

91. Plaintiff felt that the reason for discipline and the discipline itself, termination, was pretextual for Plaintiff's known, impending need to take protected medical leave.

92. Plaintiff's Regional Manager gave Plaintiff some time to clean out her office and as Plaintiff was packing up her belongings, Plaintiff's Regional Manager stated she felt very bad about letting Plaintiff go.

93. The Regional Manager further stated that the reason she felt bad was because Plaintiff's husband was so ill and in the hospital.

94. Plaintiff left her place of employment without getting the chance to apply for FMLA.

95. Defendant interfered with Plaintiff's right to apply for FMLA.

96. Defendant terminated Plaintiff prior to her submitting her FMLA forms.

97. Plaintiff was fired because of Defendant's desire to preclude Plaintiff from being out of work on FMLA, despite her being eligible and qualifying due to her husband's serious medical condition.

98. Plaintiff's husband passed away on January 31, 2018, not long after Plaintiff's unlawful termination.

99. As a direct and proximate result of Plaintiff's employer's actions and omissions, which are in violation of federal and state law, Plaintiff suffered loss of income, earning potential, and other economic damages; experienced humiliation, and loss of standing in the community; suffered and continue to suffer from extreme emotional distress and mental anguish resulting in physical injury; and suffered other injuries.  All damages continue to date.

### COUNT ONE
*INTERFERENCE WITH EXERCISE OF RIGHTS*
*DISCRIMINATION*
*RETALIATION*
**Violation of Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA) and Connecticut General Statute Chapter 557, Sec. § 31-51m ("§ 31-51m")**

100. ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

101. Plaintiff was eligible for FMLA and coverage under § 31-51m as of December 29, 2017; she worked for Trio Properties LLC, for more than twelve (12) months and was employed for at least 1,250 hours preceding the desired leave in or about early January of 2018.

102. Defendant Trio Properties LLC, was a covered entity and employer, as defined by FMLA and § 31-51m, between 2017 and Plaintiff's termination in 2018.

103. Plaintiff's immediate family member, her husband, had a qualifying medical condition as of December 29, 2017.

104. As alleged above, Plaintiff was protected from interference with her rights under FMLA and § 31-51m, as well as protected from discrimination and retaliation under the FMLA and § 31-51m, simply for exercising her rights.

105. Trio Properties LLC, interfered with Plaintiff's FMLA and § 31-51m rights, violating *inter alia*, FMLA and § 31-51m.

106. Plaintiff was discriminated against and was retaliated against for attempting to exercise her rights, as described above, violating *inter alia*, FMLA and § 31-51m.

107. Defendant terminated Plaintiff when they became aware that she was about to apply for FMLA and § 31-51m and take leave for her husband's serious medical condition, violating *inter alia*, FMLA and § 31-51m.

108. Defendant's and its agents' aforesaid conduct interfering with Plaintiff's rights, discriminating, and retaliating against Plaintiff, was willful conduct and/or conduct in reckless disregard of whether the conduct was prohibited.

109. Plaintiff was damaged as a proximate result of Defendant's and its agents' intentional conduct in the ways aforesaid.

110. Defendant is responsible for its agents acts and omissions under the theory of respondeat superior.

## COUNT TWO
### *JOB MISCLASSIFICATION AND FAILURE TO PAY OVERTIME WAGES*
*Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA") and the Connecticut Minimum Wage Law General Statute § 31-58 et seq. (§ 31-58")*

111. ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

112. Defendant Trio Properties, LLC, is an employer and covered entity, as defined under FLSA and § 31-58 and therefore, FLSA and § 31-58 provides protection to Plaintiff.

113. Plaintiff regularly worked evenings, weekends, and over 40 hours per week.

114. Plaintiff's job did not involve sufficient exercise of discretion or independent judgement to qualify as exempt under FLSA and § 31-58.

115. Defendant Trio Properties, LLC, nonetheless, paid Plaintiff as an exempt (salaried) employee; as such, Plaintiff was paid no overtime for the hours over 40 hours per workweek that she worked.

116. Defendant Trio Properties, LLC, is responsible for tracking the actual hours worked for all non-exempt employees and maintain these records.

117. Defendant Trio Properties LLC, as employer, is responsible for establishing that employees come within exemption.

118. Defendant Trio Properties, LLC failed to properly classify Plaintiff's job as a non-exempt job; therefore, Defendant Trio Properties, LLC failed to pay Plaintiff the required overtime.

119. Defendant Trio Properties, LLC, therefore violated the FLSA and § 31-58.

120. Plaintiff was damaged as a proximate result of Defendant's and its agents' intentional conduct in the ways aforesaid.

121. Defendant Trio Properties, LLC, acts were knowing and willful and/or conduct in reckless disregard of whether the conduct was prohibited.

122. Defendant Trio Properties, LLC, is responsible for its agents acts and omissions under the theory of respondeat superior.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a. Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b. Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c. Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her mental anguish, emotional pain and suffering, damage to her reputation, loss of standing in the community, and other damages incurred;

d. Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

e. Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for their malicious conduct, recklessness conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

f. Order, for all applicable Counts, that Defendant pay post-judgment interest where appropriate and allowable by law;

g. Order, for all applicable Counts, that Defendant pay pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

h. Retain jurisdiction of this action to ensure full compliance; and

i. Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

*PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

December 23, 2018               Respectfully Submitted,
                                PLAINTIFF, MIA BERUBE,
                                By her attorney,

                                 /s/ Paige Munro-Delotto

                                Paige Munro-Delotto, Ph.D., Esq.
                                CT Federal Bar #: ct30410
                                Munro-Delotto Law, LLC
                                400 Westminster Street, Ste. 200
                                Providence, RI 02903
                                (401) 521-4529
                                (866) 593-9755 (fax)
                                Email: Paige@pmdlawoffices.com
                                *Counsel for Plaintiff*